[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Motion Granted that Records to Be Kept Confidential C.G.S. 46b-11
The plaintiff wife commenced this action against defendant husband, seeking a dissolution of their marriage on February 18, 1967 at New Haven, by service of process on February 24, 1988. She claimed a dissolution, custody, support, alimony, an order of assignment of real and personal estate of the defendant, counsel fees and other relief.
Defendant filed his answer to the complaint and his cross-complaint on June 19, 1989. Defendant claimed a dissolution, joint custody and support of the minor children, an order of assignment of all or part of the estate of the plaintiff, and conveyance of her interest in jointly owned property, counsel fees, and other relief.
The pleadings support the following conclusions: (1) that this court has the necessary jurisdiction over these parties; (2) that only two of the four children issue of the marriage are minors as of this date, to wit:
 Joshua Drew, born on April 2, 1974, and Jessica Maria, born on July 19, 1976
The pleadings and the evidence also support the conclusion CT Page 334 that the marriage has broken down irretrievably.
An order will enter on the complaint adjudging the marriage dissolved on the ground of irretrievable breakdown. All other issues and prayers for relief are, more or less, fully contested.
Custody and Visitation
On November 18, 1988 defendant filed a "Motion For Joint Custody Pendente Lite" (#137). There is no indication in the file of any judicial order on that motion or any agreement extra judicial concerning the need for a technical and definitive restriction on custody and visitation. The above identified teens are rapidly approaching legal emancipation. They have maintained a stable albeit not a perfect relationship with their father since February 28, 1988.
"If it ain't broke, don't fix it."
The existing relationship between the father and these teens has continued since February of 1988 on a "play it by ear" basis. The court concludes on the evidence that no order of specific custody or visitation is warranted under past or present conditions and circumstances, except to record that both parents continue as joint custodians under Conn. General Statutes 46b-56a, and that the father be awarded liberal visitation rights including overnight visits and vacations as mutually agreed upon by either or both of these teens. It is concluded that the best interest of each teen is to remain living with the mother at the family residence.
As noted by the attorney for these teens in her trial brief, the children have achieved some excellent equilibrium in their relationship with their father. The court agrees that this equilibrium should not be upset by new and intimidating court orders. People, like water, eventually seek their own level.
The father and these teens should continue to communicate unencumbered and work out visitation, trips, overnights, vacation times and activities as convenient and mutually agreeable.
Section 46b-56a(a) clearly enunciates its purpose "to assure the child of continuing contact with both parents." The present arrangement conforms to that statute.
The parties shall continue to share joint legal custody of the minor children. The children's primary residence shall be with plaintiff. Joint custody shall mean that they shall consult with each other on all major decisions. Major decisions are defined as those key issues affecting the children's health, CT Page 335 growth and development, and shall include but not be limited to choices of school, extended absences of more than five days away from both parents, matters regarding automobiles and driving and major non-emergency medical or dental treatment. Plaintiff and defendant shall mutually agree in reaching conclusions in such major areas of concern, unless urgent circumstances make that impractical.
Routine day-to-day decisions, including but not limited to homework, day-to-day school, religious, social and athletic activities customary for children of their age and maturity, shall be made by the parent with whom Joshua and Jessica are actually staying.
The father must notify the children promptly if he is unable to keep any of their mutually agreed upon plans.
Each parent must understand that the controlling factor in visitation is the individual preferences of each child. The minor children must be given to understand that the court has not entered any order that they must spend time with their father or that they must make any decisions that enhances their relationship with their father or their mother.
The parties are instructed to utilize the mediation of the Family Relations Division of the Superior Court as a means to resolve disputes. Failure of either parent to attend the initial meeting of such mediation, so that the other party initiates court proceedings resulting in court-ordered mediation, may, at the court's discretion, subject the party who refused to mediate to attorney's fees and costs. The total number of requests for such initial mediation should not exceed two in any calendar year, it being the intent that after two initial mediations in a calendar year, either party may initiate court proceedings.
 Statutory Considerations For Orders C.G.S. 46b-81(c), 46b-82, 46b-84(b) and 46b-62
The legislature has mandated certain findings by the court in family matters as follows:
1.
Length of the marriage — twenty-one years to 1988. Courtship and the present pending litigation adds four years to their relationship.
Causes for the dissolution of the marriage — disintegration of purposes or prospective of family life. His main objective was to enhance his professional life and material wealth. Her main CT Page 336 objective was to enhance the stability of the family as a unit. She devoted her energies and attention to homemaking activities and primary caretaking responsibilities. They experienced numerous incidents of disharmony and aggravation starting with the honeymoon. Most of these incidents provide no more than a "mask" or "subterfuge" to the fact that they slowly "drifted" apart and lost that mutual attraction by which the elements of a marriage are held together. Defendant's original claims that (1) she failed to understand his needs, and (2) they had disagreements concerning the children, expanded into other incidents at trial. She sought solace in psychiatric therapy. He found solace in a new relationship with a younger woman. His professional and business endeavors materialized into profit and prestige in his chosen field. He claims that she failed to "grow with him." She explains that her domestic life and childrearing responsibilities prevented more active participation in his advancement. On a comparative or percentage of fault basis, the "other woman" cause was the basic cause and weighs the heaviest. He met her in January of 1985. He hired her in June of 1986. Plaintiff was aware of her employment from the start. She recognized this employment of a young, attractive, personable female as a threat to their marriage and the stability of their family life. It upset plaintiff and added stress to their problems.
He left the family home in February of 1988. He immediately sought comfort and companionship with her. Her starting salary was about $25,000.00 a year plus the use of a car. Her present salary is almost double her starting pay, plus a non-interest bearing loan and reimbursement for business expenses. There is no need to repeat in detail the extent of this fully blossomed relationship. The court has reviewed Neff v. Neff, 96 Conn. 273,275 (1921); Zeiner v. Zeiner, 120 Conn. 161, 165 (1935); and Brodsky v. Brodsky, 153 Conn. 299 (1966), and concludes that further articulation of plaintiff's claims on this evidence is unnecessary.
Age: Both approaching fifty.
 Health: His — good except for skin problem and back pain. Hers — physical, good. Emotional, indicates stress of dissolution.
 Station: His — very successful in his professional life. Hers — suburban housewife, out of job market for over twenty-plus years.
 Occupation: His — self-employed, bright future. Hers — can be recertified to teach elementary grades. Poor job market for teachers. CT Page 337
 Amount and Source of Income: His — very bright future in rapidly growing profession. Hers — completely dependant on alimony and support for immediate future.
 Vocational Skills: His — top percentage of his profession. Hers — teacher and guidance counsellor. Has been "out of touch" over twenty years. Poor market.
 Employability: His — self-employed, very bright future. Hers — very poor, in highly competitive market.
 Estate: His — as set forth on financial affidavit in file. Hers — depends on court orders in this case. No other substantial assets.
Liabilities and needs of each of the parties and the opportunity of each for future acquisition of capital assets and income.
Together they are solvent with combined assets of his wholly owned corporation and their real estate exceeding by far their combined liabilities.
His opportunity for future acquisition of capital assets and income is unlimited as long as he remains in good health.
Her opportunity for future acquisition of capital assets and income is limited due to her emotional health and the teaching market.
At this point it should be noted that by terminating her teaching career to raise a family she has no pension rights or vested interest in any source of funds for retirement or her old age except, of course, her "spin off" entitlement as a divorced spouse under the Social Security Act. In the event that she gains employment, life expectancy is limited and any future pension would reflect that limitation.
Support
Defendant is committed to continue private school for his two teen-aged children who will continue to reside with their mother as part of the household. Defendant is ordered to pay child support of $150.00 per week per child, payable by check to be issued on Friday of each week until each child reaches age eighteen. (Please coordinate with alimony hereinafter). CT Page 338
Defendant shall claim both minor children as exemptions for income tax purposes. Plaintiff shall timely execute all documents necessary to effectuate same.
Defendant shall provide medical and/or dental coverage, including major medical, as available through his employment for the benefit of the minor children and unreimbursed costs thereof, if any.
Until each minor child attains the age of eighteen, the defendant shall pay the costs of private school education for secondary school, including but not limited to the expenses of tuition, books, room, board, lunches and busing. Plaintiff shall first be required to exhaust the funds in each minor child's UGMA account for the tuition costs of said minor child prior to defendant paying any additional tuition costs for said minor children.
It must be noted that defendant "intends" to continue to finance the education of his two adult offspring. After gaining clear title to substantial real estate as set forth hereinafter, necessary financing should be available.
 Assignment of Property and Transfer of Title and Alimony C.G.S. 46b-82
The findings enumerated above under support apply also to transfer of property and alimony.
 "the statute gives no priority to any single criterion in determining a property division." McPhee v. McPhee, 186 Conn. 167, 172 (1982).
 "The purpose of a lump sum distribution as a property settlement is to make an equitable division of property." McPhee, 170.
 "A court must, therefore, `unscramble' ownership of property in order to give each spouse what is equitably his or hers. Id. An equitable division of property upon divorce or dissolution envisions that full recognition by the courts will be given to the noneconomic contributions of both spouses."
 "A property division ought to accord value to those nonmonetary contributions of one spouse which enable the other spouse to devote substantial effort to paid employment which, in turn, enables the family to acquire tangible CT Page 339 marital assets. The investment of human capital in homemaking has worth and should be evaluated in a property division incident to a dissolution of marriage. We hold, accordingly, that an equitable distribution of property should take into consideration the plaintiff's contributions to the marriage, including homemaking activities and primary caretaking responsibilities." O'Neill v. O'Neill, 13 Conn. App. 300, 311
(1988).
 "The State allows divorces, not as a punishment to the offending party nor as a favor to the innocent party, but because the State believes its own prosperity will thereby be promoted." Dennis v. Dennis, 68 Conn. 186, 197 (1896).
In Exhibit 98, defendant lists 18 items of personal property that he claims have sentimental value to him. His claims are that these items came from his father, grandmother, grandfather, great-grandmother and great-uncle. She claims many of the items have sentimental value to the children, especially at Christmas time.
The following items are to be turned over to defendant: 1, 2, 3, 4, 5, 6, 7, 8, the first item 9, the second item 9, 10, 16, the tools, vise and table saw under 17, and 18.
The plaintiff may retain the following items: 11, 12, 13, 14, 15 and the tree trimmer under 17.
Plaintiff is granted possession and ownership of the following personal property: (1) her IRAs: (2) jewelry (3) all furniture, furnishings and antiques not enumerated above, at the Cheshire family residence and at the Madison summer home: (4) oriental rugs (5) Dime Savings Bank Stock (6) Boston Whaler, trailer, canoe and two row boats: (7) 1977 Volvo; (8) 1984 Jeep; and (9) Attianese loan.
Defendant is granted possession and ownership of: (1) PACAM, Inc.; (2) his IRAs; (3) jewelry; (4) all furniture, furnishings and antiques at Block Island and Southington; (5) 36' Cape Dory, Avon Rederest boat, windsurfer and canoe; (6) guns (if in addition to those enumerated above); (7) 1963 Ford; and (8) 1965 Mercedes.
The UGMA funds to be spent on education for any of children until exhausted.
Within seven days of the date the dissolution becomes a final judgment, plaintiff shall transfer to defendant all his personal property that has been stored in the safe deposit box from the CT Page 340 date that plaintiff received the only key to said safe deposit box.
Within seven days of the date the dissolution becomes a final judgment, plaintiff shall return to defendant all documents and copies thereof, as well as any other personal property removed by the plaintiff and/or her agents for the defendant's offices. Items marked in evidence available in clerk's office to attorneys after appeal time expires.
Defendant shall be responsible for liabilities on Schedule 3 of his June 14, 1990 Financial Affidavit. Plaintiff shall be responsible for liabilities listed on her Financial Affidavit of June 4, 1990 except the legal fees and expenses covered hereinafter.
A study of the real property values recorded on "Defendant's Proposed Distribution Re Real Estate" surprisingly presents a reasonable approach to a sensible division and distribution of these assets. The acquisition of all the real estate owned by him and by them resulted from their combined efforts and contribution to the marriage. There is no question but that her homemaking and caretaking contributed to the acquisition, preservation and appreciation of all of the aforesaid properties. Jackson v. Jackson, 17 Conn. App. 431, 433 (1989). A comparison of the appraised fair market values of all the properties results in an insignificant variation except for the Madison properties.
Using the combined "net" figures on defendant's proposed distribution, i.e. $634,575.50 and $852,266.00 = $1,486,841.50; and based on a conclusion of a 50/50 contribution, each party has an equity value of $743,420.75 in these properties.
An order will enter that plaintiff convey her one-quarter (1/4) interest in 1175-1185 South Main Street, Cheshire, her net one-quarter (1/4) interest in 5 Mitchell Avenue, Cheshire, and her interest in 16-18 Hungerford Street to him.
An order will enter that defendant convey his interest in 188 Pleasant Street, Cheshire, and net interest in 38 Waterbury Avenue, Madison, together with the accompanying interest in the waterfront lot, to plaintiff.
A comparison of appraisals of the real estate indicates that considering current market and economic conditions, the court accepts the defendant's presentation of appraisals on its proposed distribution of real property. The only significant variation concerns the Waterbury Avenue, Madison, property. Plaintiff's appraiser (Exhibit CCC) returned a value of $260,000.00 for the property and beach rights. Defendant's appraiser (Exhibit 56) CT Page 341 returned a fair market value of $335,000.00 for the same property reported as $325,000.00 on the proposed distribution and employed by the court in the following computation.
The court accepts the $325,000.00 figure based on a study of the "Location Map", page 21 of Exhibit 56, and the five comparable sales reported therein, all five locations being with the same immediate area. These reported sales prices are: (1) $324,000.00; (2) $350,000.00: (3) $340,000.00; (4) $355,000.00 and $318,500.00. The $325,000.00 figure is more realistic than $260,000.00.
 Recapitulation of Real Estate Equities After Above Orders
His Hers
 $ 852,266.00 $ 634,575.50 South Main Street + 25,975.75 — (25,975.75) Mitchell Avenue + 24,274.75 — (24,274.75 ------------- -------------- $ 902,516.50 $ 584,325.00
 He gives her (159,095.75) 159,095.75 ------------- -------------- $ 743,420.75 $ 743,420.75
Plaintiff and defendant, via their attorneys, must execute necessary deeds or documents to remove any technical encumbrances on recorded land titles.
Following these conveyances and defendant's payment of the cash, plaintiff can pay off both mortgages on her properties and have funds available for necessary repairs. He has ample equity in his retained real estate to raise the necessary funds. She will have her properties free and clear. He will have title to the retained properties free of any claim from her. This distribution entitles him to continue his business and professional endeavors without interruption guaranteeing income to meet his educational, support and alimony obligations. She will have no involvement in either his business or income producing properties.
In the event he is unable to raise cash, consideration should be given to a mortgage on the retained properties.
Parties must simultaneously execute all releases of lis pendens and deeds necessary to transfer interest in above identified real property. Plaintiff must transfer her interest in the City Trust Account (Triple H Operating Account) to him. CT Page 342
Alimony
Defendant has two sources of income: (1) his activities as a lobbyist, and (2) his activities in management consulting. These activities are merged in his corporate entity entitled "Public Affairs Consulting Associates Management, Inc."
His employment history reflects a job in the aircraft industry, as a starter, followed by an admirable steady progression up the ladder to his present "top of the line" status in his chosen profession. There can be no doubt that he did it "his way" on his own. At the same time his family life and his reproductive and marital responsibilities kept pace due in no small way to her contributions, dedication and sincerity to their family relationship.
Testimony from experts as to the value of his corporation provides little assistance to the court on which to predicate a fair and equitable lump sum division of that personal service entity.
There is no doubt that her caretaking and homemaking activities contributed to the success of his professional life. The only available means to compensate her for this contribution is by way of alimony. It would be meaningless to order him to transfer a percentage of his stock to her since it is a personal services source of revenue. She is entitled to be compensated by him for her contribution to his success. The only means available is periodic alimony.
On her financial affidavit dated June 4, 1990, she reports that she needs $1,900.00 for weekly living expenses and an additional $545.00 weekly for payment of liabilities, for a total of $2,445.00. The largest debts are for her expenses in this litigation, i.e. legal, accounting and appraisal fees.
A reduction in the items listed on said affidavit, taking into consideration that she will no longer have mortgage payments on the family residences or the Madison property, and the order to be entered hereinafter on attorney's fees and litigation expenses, the court concludes that an order must enter for weekly alimony payments of $1,200.00 per week, payable on each and every Friday, starting on Friday, August 3, 1990.
Recapitulation
$1,200.00 alimony X 52 = $62,400.00
 $ 300.00 child support X 52 15,600.00 ------------- CT Page 343 $78,000.00
 To be reduced by $150.00 per week on 4/2/92, or $7,800.00 ------------- $70,200.00
 To be reduced by $150.00 per week on 7/19/94 $7,800.00 -----------
Starting 7/20/94 unless modified $62,400.00
Said alimony payments shall terminate in the event of:
1) Wife's remarriage or death;
2) Husband's death;
3) Modification order 46b-86(b).
 Fees for Attorney for Plaintiff and Attorney for Minor Children C.G.S. 46b-62
The statutory mandate that controls fees for the attorney for minor children states:
 "`respective financial abilities' of the parents `and the criteria set forth in section 46b-82.'"
The attorney for the minor children has filed her bill in the amount of $4,562.50, which defendant must pay as plaintiff has no ability to satisfy that obligation in whole or in part. (Invoice in file).
Exhibit XXX indicates as of June 19, 1990 a balance due to plaintiff's attorney of $35,165.60. A $10,000.00 retainer was paid from joint funds. The plaintiff does not have the financial ability to pay the balance of $35,165.60.
Defendant is ordered to pay the balance of $35,165.60, plus taxable costs and any of him out of pocket expenses properly incurred in this litigation.
Insurance
Defendant is ordered to continue his life insurance with his children as beneficiaries under the trust therein created. CT Page 344
This court in its discretion has entered the above order for period (weekly) alimony payments and has not attempted to enter a qualified domestic relation order pursuant to the Internal Revenue Code. It is the court's conclusion that this decision best protects plaintiff's equity in her contribution to defendant's corporation, i.e. his personal services activities source of income.
 Witness Fees C.G.S. 52-280
 "(f) When any . . . real estate appraiser is summoned to give expert testimony in any proceeding, the court shall determine a reasonable fee to be paid to the. . .real estate appraiser and taxed as part of the costs. . . ."
Finding
Mr. Anthony Calavolpe $7,500.00
Mr. Casper Amodio 750.00
Mr. Louis E. Durocher 3,850.00
Mr. George J. Russo 1,600.00
Mr. Robert J. Kennedy, Jr. 800.00
 "(g) When any public accountant. . .is subpoenaed. . .to testify in his capacity. . .the court shall determine a reasonable fee to be paid. . .and such fee shall be paid by the party issuing such subpoena."
Finding
Mr. Robert Lupkin, C.P.A. $ 4,100.00
Mr. Paul Greenberg, C.P.A. 5,865.00
Restraining Orders
Having considered the defendant's revised proposed orders and his application for relief from contacts by plaintiff with the defendant, it is hereby ordered, effective immediately.
Plaintiff shall be restrained from contacts with the defendant, either directly or indirectly, which contacts are harrassment and/or interference with the orderly conduct of the CT Page 345 defendant's clients, defendant's business contacts and associates, defendant's competitors and employees of Public Affairs Consulting Associates Management, Inc. In addition, the plaintiff shall be restrained from:
A. Appearing at defendant's business functions.
 B. Discussing defendant's personal life in the presence of his employees, clients, business contacts, associates and defendant's competitors.
This case was classified as a "limited contested" dissolution. It did, however, require resolution of deep-seated and often emotionally charged issues inherent in most dissolution actions. This court has considered the provisions of the above-cited statutes and the entire evidence, both testimonial and material (over 200 exhibits and 2 weeks of trial), in its search for the true facts on which to predicate appropriate property, support and alimony awards. A crucial issue for the court was the issue of credibility between the parties with respect to the question of inherited property and property acquired with funds thereafter.
The evidence is clear that during the "build up" days, properties were recorded in joint names. Contrary to defendant's claim at trial, it was their mutual intention that their marriage and family life was a partnership. He was the income producer, she was the homemaker and caretaker of the children.
Her testimony and the material evidence was the more credible. Her contributions to the marriage and family life was a substantial factor to the increase in value of all the marital assets.
Because this case presented complex issues and extensive testimony, the attorneys and the parties should feel free to bring to the court's attention any requested order that was not covered in this memorandum of decision and/or file a written stipulation on any modification.
Judgment may enter for the plaintiff on the complaint, plus costs.
Judgment may enter for the plaintiff on the counter claim.
JOHN N. REYNOLDS, STATE TRIAL REFEREE CT Page 346